## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

MILWAUKEE DIVISION

| | |
|---|---|
| [UNDER SEAL], | COMPLAINT |
| Plaintiffs, | Case No. |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA UNDER SEAL** |
| Defendant. | **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**DOCUMENT TO BE KEPT UNDER SEAL**

Attorneys for [under seal]

Nola J. Hitchcock Cross
Wisconsin Bar #1015817
B. Harper Dickerson
Wisconsin Bar #1142160
Cross Law Firm, S.C.
The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055
Email: njhcross@crosslawfirm.com
        dickerson@crosslawfirm.com

1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

MILWAUKEE DIVISION

United States of America *ex rel*. Bhavik Desai.,

    Plaintiff and Relator,

v.

L.M.G. Inc.,
Affiliated Health of Wisconsin, Ltd.,
2626 Wauwatosa Avenue, LLC, d/b/a Radiology & Dental
Imaging Center & d/b/a TMJ & Orofacial Pain Treatment
Centers of Wisconsin,
Harkins Pain & Sleep Management Group,
Jay Mackman,
Connor Peck,
Matthew Merlo,
Stephen Harkins, and
Debra Mackman,

    Defendants.

---

**FALSE CLAIMS ACT COMPLAINT**

---

Nola J. Hitchcock Cross
Wisconsin Bar #1015817
B. Harper Dickerson
Wisconsin Bar #1142160
Cross Law Firm, S.C.
The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:   (414) 273-7055
Email: njhcross@crosslawfirm.com
       dickerson@crosslawfirm.com

2

**TABLE OF CONTENTS**
I. INTRODUCTION TO THE FRAUD......................................................................................5
          Figure 1.................................................................................................. 8
II. STATEMENT OF THE CASE.......................................................................................11
III. FEDERAL JURISDICTION AND VENUE..................................................................12
IV. PARTIES...................................................................................................................... 13
    A. Relator.................................................................................................... 13
    B. Government Plaintiff............................................................................... 13
    C. Corporate Defendants..............................................................................13
        a. L.M.G., Inc............................................................................... 13
        b. Affiliated Health of Wisconsin, Ltd .............................................14
        c. 2626 Wauwatosa Ave, LLC.........................................................14
        d. Harkins Pain & Sleep Management Group....................................15
    D. Individual Defendants............................................................................ 15
        a. Connor Peck.............................................................................. 15
        b. Jay Mackman..............................................................................15
        c. Matthew Merlo.......................................................................... 15
        d. Debra Mackman......................................................................... 16
        e. Stephen Harkins.........................................................................16
V. LEGAL AUTHORITY...................................................................................................16
    A. The False Claims Act..............................................................................16
    B. Medicare, Medicaid, and Other Federal Healthcare Programs.......................18
    C. Medicare Enrollment and Participation.......................................................21
    D. Specific Billing Codes for Dentistry Services.............................................23
    E. Wisconsin Legal and Regulatory Authority.................................................25
    F. The Stark Law.........................................................................................26
VI. FACTUAL BACKGROUND.........................................................................................28
    A. Relator................................................................................................... 28
    B. Corporate Defendants...............................................................................30
    C. Wisconsin Corporate Defendants' Organizational Structure..........................32
    D. Individual Defendants............................................................................. 33
VII. DEFENDANTS' FRAUDULENT CONDUCT AND FALSE CLAIMS.............................34
    A. The X-Ray Schemes................................................................................ 34
        Figure 2................................................................................. 36
        Figures 3 and 4....................................................................... 36
        Figure 5................................................................................. 37
    B. The Unlicensed/Unsupervised Provider Scheme.........................................47
    C. The Self-Referral and Scheduling Scheme.................................................50
    D. The Overpayment Retention Scheme.........................................................55
        a. The X-Ray Schemes.................................................................. 55

3

b. The Unlicensed/Unsupervised Provider Scheme.................................................56

c. The Self-Referral and Scheduling Scheme.......................................................56

E. Conspiracy.................................................................................................... 57

a. The X-Ray Schemes....................................................................................... 57

b. The Unlicensed/Unsupervised Provider Scheme.................................................59

c. The Self-Referral and Scheduling Scheme.......................................................60

VIII. WISCONSIN DEFENDANTS'RETALIATION AGAINST RELATOR...........................61

IX. COUNTS.................................................................................................................64

Count 1: Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)..........................64

Count 2: Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)..........................65

Count 3: Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)..........................66

Count 4: Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)..........................67

Count 5: Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)..........................68

Count 6: Violations of the Stark Law, 42 U.S.C. § 1395nn(a)(1)(A)-(B)..........................69

Count 7: Conspiracy to Violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)..............69

Count 8: Violations of the False Claims Act, 31 U.S.C. § 3730(h)...................................70

X. PRAYER FOR RELIEF.............................................................................................71

NOW COMES **Relator Bhavik Desai, DMD, Ph.D,** through his attorneys, Nola J. Hitchcock Cross and B. Harper Dickerson of Cross Law Firm, S.C., and states that this is an action brought **on behalf of the United States of America** against **Defendants L.M.G., Inc., Affiliated Health of Wisconsin, Ltd., 2626 Wauwatosa Ave, LLC, d/b/a Radiology & Dental Imaging Center and d/b/a TMJ & Orofacial Pain Treatment Centers of Wisconsin, Harkins Pain & Sleep Management Group, Jay Mackman, Debra Mackman, Connor Peck, Matthew Merlo, and Stephen Harkins**, pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, for knowingly submitting or causing the submission of false claims for payment to the United States of America, as well as to the State of Wisconsin's federally funded healthcare programs, including Medicare and Medicaid.

Relator also brings this action on his own behalf to obtain a Relator's share of the federal government's recovery and for Defendants' retaliation and discrimination against him for his attempts to oppose their fraudulent schemes.

As and for his allegations against Defendants, Relator states as follows:

## I. INTRODUCTION TO THE FRAUD

1. Defendant Jay Mackman is no stranger to healthcare fraud: On January 15, 2020, Mackman's dental and orofacial treatment practice, Defendant L.M.G., Inc. (hereinafter "LMG") doing business as, among other entities, Defendant TMJ & Orofacial Pain Treatment Centers of Wisconsin (hereinafter "TMJ") made a deal with the United States of America to pay $1,000,000.00 to the Government "to resolve allegations" of violations of the False Claims Act.

2. In its January 15, 2020 press release, the United States Department of Justice, through Matthew D. Krueger, then the United States Attorney for the Eastern District of Wisconsin, announced that the settlement resulted from allegations "that TMJ & Orofacial Pain Treatment

5

Centers of Wisconsin and its dentists did not fabricate the appliances" for which they billed the Government, "but rather purchased them from an outside laboratory that fabricated the appliances," and "that TMJ falsely billed Medicare and Tricare for oral appliances under billing codes applicable to expensive prosthetic devices fabricated by surgeons, rather than other lower paying billing codes applicable to appliances fabricated by an outside laboratory." http://www.justice.gov/usao-edwi/pr/tmj-orofacial-pain-treatment-centers-wisconsin-agree-pay-1-million-resolve-false-claims, accessed October 7, 2025.

3. Despite this history, since that $1 million settlement, Defendants have brazenly carried out fraud further against the Government, including with the assistance of Defendant Stephen Harkins and his company, Harkins Pain & Sleep Management Group.

4. After taking a hiatus from treating Patient-Beneficiaries of Medicare and other Government healthcare programs, by no later than the fall of 2023, Defendants resumed and expanded their schemes to submit false claims for payment for Patient-Beneficiaries of Government healthcare programs, including Medicare, Medicaid, TRICARE, and CHAMPUS:

  a. *The X-Ray False-Coding Scheme*, in which non-reimbursable X-ray scans are fraudulently billed to the Government using false billing codes and descriptions to induce the Government to pay Defendants for non-reimbursable services;

  b. *The X-Ray Multiple-Billing Scheme*, in which a single computerized tomography ("CT") scan is split into as many as seven (7) fragmented images that Defendants then bill to the Government as if seven (7) separate images were taken;

  c. *The Unlicensed/Unsupervised Provider Scheme*, in which non-dentist providers bill the government for unsupervised procedures performed on Patient-Beneficiaries, which procedures may only be legally performed by or under the

6

supervision of a licensed dentist pursuant to Wis. Stats. ch. 447, and the performance of which by practitioners without proper licensure can result in serious health consequences for Patient-Beneficiaries, including permanent jaw damage;

d.     *The Self-Referral & Scheduling Scheme*, in which Patient-Beneficiaries at Defendant TMJ are referred, and often preauthorized and just scheduled directly, for in-house radiology services at Defendant Radiology & Dental Imaging Center (hereinafter "Imaging Center") and/or for physical therapy services at Defendant Affiliated Health of Wisconsin, Ltd. (hereinafter "Affiliated Health"), even when such services are not reasonable or medically necessary, causing economic harm to Patient-Beneficiaries and taxpayers alike;

e.     *The Overpayment Retention Scheme*, in which all Defendants conspire, despite their clear knowledge of the illegality of these schemes, to conceal their obligations to return overpayments fraudulently obtained from the Government through these schemes; and

f.     The broader *Conspiracy* between the Corporate Defendants and the Individual Defendants to implement all these schemes to obtain Government funds to which they are not entitled.

5.     Defendant LMG owns and operates three (3) related medical practices, all of which are required to refer Patient-Beneficiaries exclusively to one another, and they often directly schedule a Patient-Beneficiary treated at one LMG practice for services at another LMG practice without allowing the Patient-Beneficiary a choice, even when the services for which the Patient-Beneficiaries are being referred are not reasonable or medically necessary.

7

a.    TMJ provides treatments, including the insertion of mandibular advancement devices ("MADs"), orthotic devices, and TMJ splints, for "complex head, face, mouth, temporomandibular joint, and neck pain, as well as for … snoring or sleep apnea." https://www.tmjtreatmentcentersofwi.com/home.aspx, accessed October 7, 2025.

b.    Affiliated Health provides "physical therapy and pain rehabilitation services," including for the same types of "neck and back pain" treated at TMJ. https://www.tmjtreatmentcentersofwi.com/home.aspx, accessed October 7, 2025.

c.    The Imaging Center "specializes in dental and maxillofacial radiology services." https://www.tmjtreatmentcentersofwi.com/home.aspx, accessed October 7, 2025.

6.    This organizational structure is depicted below in Figure 1:



*[Fig. 1: A chart demonstrating the organizational structure of Defendants' businesses.]*

8

7. Defendants utilize their vertically integrated organizational structure to maximize the revenue they can reap from individual Patient-Beneficiaries' care, internally referring patients from TMJ to Affiliated Health and the Imaging Center, all three (3) of which entities are under LMG's common ownership.

8. Until early 2025, Defendant Jay Mackman owned the practices LMG, TMJ, Affiliated Health, and the Imaging Center, but Defendants Connor Peck and Matthew Merlo are the current joint owners; nevertheless, Defendant Jay Mackman continues to the present to work as a dentist with LMG and, on information and belief, to share in the profits.

9. Defendants have conspired to and engaged in multiple fraudulent schemes which have caused the Government to make substantial payments to Defendants to which Defendants were not entitled, in violation of the False Claims Act.

10. Specifically, Defendants have claimed and/or represented:

    a. that they are performing reimbursable services when in fact they are not (***the X-Ray False-Coding Scheme***);

    b. that they are performing a dramatically higher number of such procedures than in fact they are (***the X-Ray Multiple-Billing Scheme***);

    c. that they are performing certain procedures in accordance with State laws and regulations in that providers with proper licensure are performing or, at least, supervising these procedures, when in fact they are not (***the Unlicensed/Unsupervised Provider Scheme***); and

    d. that they have no obligation to return overpayments received through the above schemes when in fact they do (***the Overpayment Retention Scheme***).

11.     Defendants have supported these fraudulent claims with falsified records and statements; indeed, the very submission of these claims necessitates the falsification of records and statements material thereto.

12.     Defendants have conspired, upon information and belief, for at least twenty (20) years, to violate the Stark Law by making impermissible, internal self-referrals between the arms of Defendants' businesses without exercising medical judgment and even when contrary to medical judgment, that is, when Defendants knew such services were medically unnecessary (***the Self-Referral & Scheduling Scheme***); in so doing, Defendants have repudiated the purpose of the Stark Law: to protect patient choice in healthcare by removing financial referral incentives for healthcare providers. 66 Fed. Reg. 856 (Jan. 4, 2001).

13.     In the capacity of his employment by Defendant LMG as a dentist and oral medicinist at Defendant TMJ, Relator discovered Defendants' ***X-Ray Schemes*** in December 2022 and attempted to halt such by raising concerns directly to Defendants Jay Mackman, Peck and others in February 2023; he discovered Defendants' ***Unlicensed/Unsupervised Provider Scheme*** and raised it to Defendants as far back as 2020 and raised concerns about it throughout his employment with LMG; and he discovered Defendants' ***Self-Referral and Scheduling Scheme*** at the onset of his employment at the beginning of 2019, and attempted to halt such by raising his concerns throughout the rest of his employment with LMG.

14.     In total, Defendants have bilked the federal Government out of a significantly larger sum through these fraud schemes than the amount they paid the government to settle in 2015.

15.     Relator's efforts to oppose Defendants' fraudulent Schemes also led Defendants to further violate the False Claims Act by retaliating against Relator, including by:

      a.     Withholding educational and vocational training opportunities;

b.      Withdrawing offers to become part owner of Defendants' practices;

c.      Pressuring Relator not to renew his employment contract; and eventually

d.      Constructively discharging Relator.

## II.      STATEMENT OF THE CASE

15.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made and failures to return funds fraudulently obtained from the Government, by Defendants in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, as amended.

16.     Relator Bhavik Desai, DMD, Ph.D, brings this *qui tam* action under seal on behalf of the United States of America for treble damages and civil damages arising from Defendants' fraudulent conduct in violation of the FCA, 31 U.S.C. §§ 3729 *et seq.*, and the Stark Law, 42 U.S.C. § 1395nn, as amended, involving false claims for payment to Government payors.

17.     Defendants' misrepresentations and acts have caused the Government to pay significant amounts to Defendants to which Defendants were not entitled.

18.     Defendants perpetrated this fraud willfully, with knowledge that their actions were in violation of the relevant laws, and through making misrepresentations which were material to the Government's payment decisions.

19.     The allegations herein are primarily based on Relator's direct and independent knowledge as gained through his employment with Defendants.

20.     As introduced in Section I above and described in detail below, Defendants conspired and continue to conspire, engaged and continue to engage in violations of the FCA since at least February 2022 by presenting, or causing to be presented, false claims for payment to

11

federally funded healthcare programs, and by knowingly concealing obligations to repay and return federal healthcare program funds which they were not entitled to receive.

21. As introduced in Section I above and described in detail below, Defendants have also engaged and continue to engage in violations of the Stark Law for about 20 years, knowingly making improper internal referrals from one Corporate Defendant to another under the same common ownership in efforts to maximize revenue, with the express intention of frustrating and obviating the purpose of the Stark Law: *to protect patient choice in healthcare through the elimination of financial incentives for providers*. 66 Fed. Reg. 856, 859 (Jan. 4, 2001).

### III. FEDERAL JURISDICTION AND VENUE

22. Acts and omissions prohibited by the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* as amended, and set forth with particularity herein, occurred in Wisconsin. Therefore, this court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) as well as under 28 U.S.C. § 1345.

23. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District and because acts committed by the Defendants and prohibited by 31 U.S.C. § 3729 occurred in this District.

24. Prior to filing, Relator provided notice of his intent to file this action to the United States Attorney's Office for the Eastern District of Wisconsin.

25. Upon filing, Relator will serve a copy of this Complaint upon the United States of America and will file the requisite disclosure materials, i.e., a written disclosure of substantially all material evidence in information in Relator's possession, with the United States Attorney's Office for the Eastern District of Wisconsin.

## IV.  PARTIES

### A.  Relator

26.    Relator Bhavik Desai, DMD, Ph.D, is a dentist, an oral medicinist, and the owner of Oral Medicine of Wisconsin.

27.    Relator worked for Defendant LMG as an affiliate dentist and oral medicinist, with TMJ being his "Home Department," to use Defendants' nomenclature printed on his LMG paycheck stub, from January 2019 through May 2025.

28.    Relator is a citizen of the United States and a resident of the State of Wisconsin.

### B.  Government Plaintiff

29.    The United States of America is a sovereign country whose Department of Health and Human Services ("HHS"), through the Centers for Medicare and Medicaid ("CMS") and other executive agencies, pays claims submitted or caused to be submitted to it by Defendants through its healthcare programs, including Medicare and, as shared with the State of Wisconsin, Medicaid, as well as other Government-funded healthcare plans.

### C.  Corporate Defendants

#### a.  L.M.G., Inc.

30.    Defendant LMG is a Wisconsin corporation with its principal place of business and its registered agent office at 2626 N. Wauwatosa Ave., Ste. 105, Wauwatosa, WI 53213.

31.    Defendant Connor Peck is the registered agent for and co-owner, with Defendant Matthew Merlo, of LMG.

32.    Defendant Peck has worked as a dentist at Defendant TMJ since about 2020.

33.    Defendant LMG is the parent company, through its subsidiary 2626 Wauwatosa Ave, LLC, of Defendants Affiliated Health, the Imaging Center, and TMJ.

13

#### b. Affiliated Health of Wisconsin, Ltd.

34. Defendant Affiliated Health is a Wisconsin corporation with its principal place of business and registered agent office at 2626 N. Wauwatosa Ave. Ste. 105, Wauwatosa, WI 53213.

35. Affiliated Health primarily provides physical therapy services.

36. Defendant Connor Peck is the registered agent for Defendant Affiliated Health.

#### c. 2626 Wauwatosa Ave, LLC

37. Upon information and belief, Defendant 2626 Wauwatosa Ave, LLC does business as TMJ & Orofacial Pain Treatment Centers of Wisconsin and as Radiology & Dental Imaging Center.

38. Upon information and belief, TMJ is one arm of the Wisconsin limited liability corporation Defendant 2626 Wauwatosa Ave, LLC, which has its principal place of business at 2626 N. 76th St., Ste. 101, Wauwatosa, WI 53213, and its registered agent office at 11415 N. Justin Dr., Mequon, WI 53092.

39. Defendant Jay Mackman is the registered agent for Defendant 2626 Wauwatosa Ave, LLC, and therefore also for TMJ.

40. Upon information and belief, the Imaging Center is another arm of Defendant 2626 Wauwatosa Ave, LLC, with its principal place of business at 2622 N. 76th St., Ste. 101, Wauwatosa, WI 53213, and its registered agent office at 11415 N. Justin Dr., Mequon, WI 53092.

41. Defendant Jay Mackman is the registered agent for Defendant 2626 Wauwatosa Ave, LLC, and therefore also for the Imaging Center.

14

### d. Harkins Pain & Sleep Management Group

42. Defendant Harkins Pain & Sleep Management Group (hereinafter "Harkins Group") is an Arizona corporation with its principal place of business and its registered agent office at 4781 E. Camp Lowell Dr., Tucson, AZ 85712.

43. Defendant Stephen Harkins is the registered agent for Defendant Harkins Group.

## D. **Individual Defendants**

### a. **Connor Peck**

44. Defendant Connor Peck is the co-owner, with Defendant Matthew Merlo, of Defendant LMG and its subsidiaries, known as "Home Departments" within the conglomerate.

45. Defendant Peck is employed by Defendant LMG as a dentist at his "Home Department," TMJ, which is one arm of Defendant 2626 Wauwatosa Ave, LLC.

46. Defendant Peck is a citizen of the United States and a resident of the State of Wisconsin.

### b. **Jay Mackman**

47. Defendant Jay Mackman is the founder and prior owner of Defendant LMG and its Home Departments; he owned Defendant LMG and its subsidiaries from 1984 until May 2025, when Defendants Connor Peck and Matthew Merlo became the new owners.

48. Defendant Jay Mackman is a citizen of the United States and a resident of the State of Wisconsin.

### c. **Matthew Merlo**

49. Defendant Matthew Merlo is the marketing manager for, the co-owner, with Defendant Connor Peck, of, and the CEO of Defendant LMG and its subsidiaries.

15

50. Defendant Merlo is a citizen of the United States and a resident of the State of Wisconsin.

**d. Debra Mackman**

51. Defendant Debra Mackman is the manager of the Imaging Center, one arm of Defendant 2626 Wauwatosa Ave, LLC), was previously a physical therapist at Defendant Affiliated Health, and has conspired with Defendants Jay Mackman, Connor Peck, Matthew Merlo, and Stephen Harkins to implement and coordinate Defendants' fraudulent schemes.

52. Defendant Debra Mackman is a citizen of the United States and a resident of the State of Wisconsin.

**e. Stephen Harkins**

53. Defendant Stephen Harkins is the owner of and a dentist at Defendant Harkins Group, as well as a colleague and co-conspirator of Defendants Jay Mackman, Connor Peck, Matthew Merlo, and Debra Mackman.

54. Defendant Harkins is a citizen of the United States and a resident of the State of Arizona.

## V. LEGAL AUTHORITY

### A. The False Claims Act

55. The False Claims Act ("FCA") was originally enacted during the Civil War and is sometimes referred as the "Lincoln Law."

56. Congress substantially amended the Act in 1986, 2009, and 2010, to enhance the ability of the United States to recover losses it sustained from false claims by further incentivizing "Relators" to file such claims on behalf of the United States.

16

56. In 1986, Congressional hearings found that false claims for payment in federal programs were pervasive and that the FCA is a primary tool for combating false claims to the government, whereupon Congress amended the Act with the intention of enhancing incentives for individuals with knowledge of false claims against the Government to disclose the information without fear of reprisals. *False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

57. The current FCA is designed to encourage the private bar to commit legal resources to pursuing fraud on the Government's behalf and to create a private/public partnership to obtain recovery for false claims submitted to the Government. *False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

58. The FCA subjects a person to liability under section 31 U.S.C. §§ 3729 (a)(1) who, *inter alia*:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; … or …
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

59. Under 31 U.S.C. § 3729 (b)(1), the "terms 'knowing' and 'knowingly'":

> (A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth of the information; and

(B) require no proof of specific intent to defraud.

60. The range of the civil penalties has been adjusted for inflation by an annual cost-of-living adjustment. Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Section 701 of the Bipartisan Budget Act of 2015, Public Law 114–74).

61. For civil penalties assessed after January 30, 2023, whose associated violations occurred after November 2, 2015, the civil monetary penalties are between $13,508 and $27,015 per violation. 28 C.F.R. § 85.5.

**B.** **Medicare, Medicaid, and Other Federal Healthcare Programs**

62. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., as amended, established the Health Insurance for the Aged and Disabled Program, commonly referred to as "Medicare."

63. Pursuant to the Medicare program and other government healthcare programs described below, the government pays claims for reasonable *and* necessary healthcare provided to its Beneficiaries.

63. Medicare has multiple parts:

a. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services, hospice services, and related care.

b. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services and outpatient diagnostic tests.

18

c.      Medicare Part C, the Medicare Advantage program, covers both Part B and

C and can cover additional services through plans administered by private insurance

companies.

d.      Medicare Part D covers the cost of prescription drugs, as well as the cost of

certain durable medical equipment ("DME").

64.     The United States Department of Health and Human Services ("HHS") is

responsible for the administration and supervision of Government healthcare plans, and its Center

for Medicare and Medicaid Services ("CMS") is directly responsible for program oversight.

65.     The Government administers other health care programs, including but not limited

to TRICARE/CHAMPUS, CHAMPVA, Federal Workers Compensation, and Medicaid.

66.     The Medicaid Program, administered by individual states and jointly funded by

State and Federal taxpayer revenue, is a health insurance program also created as part of the Social

Security Act, 42 U.S.C. §§ 1396-1396v.

67.     TRICARE/CHAMPUS, administered by the United States Department of Defense,

is a health care program for individuals and their dependents associated with the U.S. Armed

Forces. 10 U.S.C. §§ 1071, *et seq.*; 32 C.F.R. § 199.4(a).

68.     CHAMPVA, administered by the United States Department of Veterans Affairs, is

a healthcare program for the families of veterans with 100% service-connected disabilities. 38

U.S.C. §§ 1781, *et seq.*; 38 C.F.R. § 17.270(a).

69.     Under 42 U.S.C. § 1395y(a), no payment may be made under Medicare Part A or

Part B for any expenses incurred for items or services which "are not reasonable and necessary for

the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body

member," or "which are not reasonable and necessary for the prevention of illness." Healthcare

19

providers may not be reimbursed by the Government for the provision of healthcare services which are not "reasonable and necessary" within the meaning of this statute.

70.     To bill Medicare Part B, a provider must submit a paper form or its electronic equivalent to its regional Medicare Administrative Contractor ("MAC").

71.     A MAC is a private health care insurer that CMS has awarded a geographic jurisdiction to process Medicare claims.

72.     Generally, pursuant to rules promulgated under the 2001 Administrative Simplification Act, claims must be submitted electronically unless certain exceptions are met, in accordance with CMS's Medicare Claims Processing Manual, ch. 1, § 02.

73.     The type of claim form required to be submitted depends on the type of provider submitting the claim. Generally, institutional providers submit 837I, or its paper equivalent, CMS 1450, also known as UB-04, while claims for the services of individual health care professionals are submitted using 837P, or its paper equivalent CMS 1500, formerly known as HCFA 1500.

74.     These claim forms describe, among other things, the provider, the Patient Beneficiary, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.

75.     Providers who submit forms 837I or CMS 1450 certify that the information provided is "true, accurate and complete" and that the specific services billed on the form are "medically indicated and necessary" for the specific Patient Beneficiary involved.

76.     Likewise, providers submitting forms 837P or CMS 1500 certify that "[s]ubmission of [a] claim constitutes certification that the billing information as shown on the face [t]hereof is true, accurate, and complete."

77. Since 1983, CMS has adopted the Current Procedural Terminology ("CPT") coding system as part of the Healthcare Common Procedure Coding System ("HCPCS") and mandated that physicians use this system to bill Medicare for their services. 42 C.F.R. § 162.1002(a)(5).

78. CPT codes are a systematic listing of procedures and services performed by healthcare providers and are used to describe and evaluate the services claimed for payment, with each code defined by the American Medical Association's regularly updated *CPT Professional Codebook*.

79. Similarly, CMS has adopted the "International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) (including The Official ICD-10-CM Guidelines for Coding and Reporting), as maintained and distributed by HHS," commonly known as diagnosis codes, and has likewise mandated that physicians use this system to bill Medicare for their services. 42 C.F.R. § 162.1002(c).

80. Thus, submission of a false CPT code or ICD-10 code on a claim for payment from Medicare, Medicaid, or other federally funded healthcare program renders the claims materially false, and the reckless or intentional submission of a false code subjects the provider to liability under the FCA.

C. **Medicare Enrollment and Participation**

81. To participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare payments. 42 U.S.C. § 1395cc.

82. For example, healthcare providers participating in the Medicare program must:

(a) Refrain from making false statements or misrepresentations of material facts concerning payment requests;

21

(b) Refrain from billing for any services or products that were not performed or delivered in accordance with all applicable policies;

(c) Be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;

(d) Comply with the applicable state and federal statutes, policies and regulations; and

(e) Refrain from engaging in any illegal activities related to the furnishing of services or products to recipients.

42 U.S.C. §§ 1395, *et seq.*

83.     To contract with Medicare, providers must complete a Medicare Enrollment Application form. "Institutional Providers," such as hospitals, nursing homes, and hospices enroll in Medicare Part A using form CMS 855A. Outpatient "Clinics/Group Practices" enroll in Part B using CMS Form 855B; individual providers enroll in Part B using CMS Form 855I.

84.     Each enrollment application form includes, *as a condition of participation in the Medicare Part B program* and therefor3e as a condition of payment, a requirement that providers be familiar with and abide by the program's payment policies and make the following Certification Statement:

> (3) *I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. . . . I understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . and on the suppliers' compliance with all applicable conditions of participation in Medicare.*
>
> …

22

(6) *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

85. In addition to their enrollment obligations, Medicare Part B providers must annually execute a Medicare Participating Physician or Supplier Agreement, CMS Form 460:

> *The above named person or organization, called "the participant," hereby enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare law and regulations and which are furnished while this agreement is in effect....*

86. The Agreement further warns that substantial failure to "comply with the agreement" will terminate the Agreement and may result in "[c]ivil and criminal penalties."

87. By executing the Provider Agreement, the Provider certifies that they will:

(a) comply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services; and

(b) assume full responsibility for the accuracy of claims submitted to the Government in accordance with the certification requirements of 42 C.F.R. § 455.18.

**D.     Specific Billing Codes for Dentistry Services**

88. Providers submitting claims for payment to federally funded healthcare programs, including Medicare and Medicaid, must support the claims they submit with CPT billing codes. 42 C.F.R. § 162.1002(c).

23

89. Pursuant to 42 U.S.C. § 1320a-7a(a)(1)(A), the Government will only reimburse providers who ensure that:

    a. No claim for an item or service is based upon a billing code that will result in the provider receiving greater payment than they would receive for the code which is applicable to the item or service actually provided; and

    b. No claim submitted for payment makes any false statements or any misrepresentations of material facts.

90. Describing some of the devices at the center of *the Unlicensed/Unsupervised Provider Scheme,* CPT code 21085 covers a provider fabricating an oral surgical splint to match a patient's facial contours by taking an impression, or a negative imprint of the patient's face; this oral surgical splint supports the patient's facial structures in orthognathic reconstruction, surgical repositioning of the jaws, or other oral surgeries.

91. The CMS fee schedule price when this CPT code 21085 procedure is performed in a healthcare facility is $450.04; when the procedure is not performed in a healthcare facility, the price is $637.01 CMS Fee Schedule, October 17, 2024.

91. CPT code E0486 covers custom-fabricated mandibular advancement devices ("MADs"), some of the devices at the center of *the Unlicensed/Unsupervised Provider Scheme,* used to treat sleep apnea, and encompasses the entire process, from creating the appliance to fitting and adjustments. No CMS fee schedule price is available for this code. CMS Fee Schedule, October 17, 2024.

92. CPT codes 99202, 99203, 99204, 99212, 99213, and 99214 cover office or other outpatient visits of varying durations requiring varying degrees of medical decision_making. In-

facility prices for these codes range from $32.46 to $122.27; non-facility prices for these codes range from $52.59 to $155.08.

93. CPT code 70486 covers only medical-grade CT scans of the maxillofacial region without dye. The in-facility price and the non-facility price for these procedures under current CMS fee schedules may be as low as $37.83 depending on how the procedure is performed—for example, whether the provider is billing for the professional component of the procedure, the technical component of the procedure, or both components. CMS Fee Schedule, October 17, 2024.

94. CBCT scans, which are non-medical grade, are *never reimbursable by Government healthcare programs and even* medical-grade CT scans must be "reasonable and necessary for the individual patient," and "are reviewed for evidence of abuse." CMS National Coverage Determination: Computed Tomography, https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=176 (effective date March 12, 2008; accessed October 7, 2025).

**E.    Wisconsin Legal and Regulatory Authority**

95. Compliance with state-law governing the relevant healthcare services being provided is a necessary condition for the provider to participate in and receive reimbursements from the Government under federally funded healthcare programs, including Medicaid and Medicare. 42 C.F.R. §§ 440.50, 440.60, 440.100.

96. Likewise, compliance "with federal or state statutes, rules or regulations applicable to the delivery of, or billing for, services under" the Wisconsin State Medical Assistance program is an express condition of a healthcare provider's participation in such program. Wis. Adm. Code § DHS 106.06(1).

25

98.    In this case, compliance with state-law provisions restricting and delineating the scope of practice for dentists, nurse practitioners, advanced practice nurses, and the like, Wis. Stat. § 447.03 prohibits persons who are not licensed to practice dentistry under Wis. Stat. ch. 447 from practicing dentistry.

99.    Dentistry is defined in Wis. Stat. § 447.01(8)(am) as "the examination, evaluation, diagnosis, prevention, or treatment, including surgery, of diseases, disorders, or conditions of the human oral cavity or its adjacent or associated tissues and structures, or of the maxillofacial area, and their impact on the human body."

100.    Under Wis. Stats. § 441.01(3)(a) and (4)(b), nurses may only provide dentistry services "under the specific direction," or "under the general or special supervision or direction of a … dentist licensed under" Wis. Stat. ch. 447.

### F.    The Stark Law

101.    42 U.S.C. § 1395nn, commonly known as the "Stark Law," and its associated regulations, 42 C.F.R. §§ 350 *et seq.*, provide that if a physician has a "financial relationship" with an entity, that physician may not make a referral to that entity for the provision of "designated health services" unless the financial relationship between the physician and the entity satisfies one of the enumerated exceptions to the Stark Law.

102.    Before passage of the Stark Law, studies demonstrated that when physicians have financial relationships with entities providing healthcare, such as hospitals, those physicians made more patient referrals to those hospitals than they otherwise would have made. 66 Fed. Reg. 856, 859 (Jan. 4, 2001).

103.    The Stark Law "prevents fraudulent and unnecessary testing, referrals, and medical services. Additionally, it prevents physicians from seeking further personal financial or equity

26

gains regarding patient of care which is a clear conflict of interest. These limitations impact clinical decision making and healthcare delivery." Ryan Huttinger & Narothoma R. Aedulla, "Stark Law," *Nat'l Inst. of Health*, https://www.ncbi.nlm.nih.gov/books/NBK559074, last updated October 6, 2022.

104. The Stark Law provides that an entity may not present or cause to be presented to Medicare a claim for "designated health services" furnished pursuant to an unlawful referral.

105. Medicare is *prohibited from making payment on any such claim.* 42 U.S.C. § 1395nn(a)(1)(B).

105. "Designated health services" within the meaning of the Stark Law include physical therapy services as well as radiology services. 42 U.S.C. § 1395nn(h)(6).

106. Compliance with the Stark Law is a material condition of payment on a claim submitted to Medicare or Medicaid for reimbursement. 42 U.S.C. § 1395nn(g)(1) (prohibiting payment for designated health services provided in violation of the Stark Law).

107. The provisions of the Stark Law have been extended to apply to Medicaid, pursuant to 42 U.S.C. § 1396b(s), and thereafter to all federally funded healthcare programs.

108. Therefore, a Stark Law violation also gives rise to FCA liability.

109. The Stark Law has various exceptions to its general rule, none of which are applicable here, including exceptions for rural healthcare providers, ancillary services provided in-office, prepaid insurance plans, and office-space rental arrangements, among others. *See, e.g.,* 42 U.S.C. § 1395nn(b), (c), (d), and (e).

## VI.    FACTUAL BACKGROUND

### A.    <u>Relator</u>

110.    In July 2025, Relator Bhavik Desai, DMD, Ph.D began operating his wholly owned practice, Oral Medicine of Wisconsin.

111.    Relator earned his bachelor's degree in dental surgery from the Government Dental College and Hospital at the University of Mumbai in India, his Ph.D in dental medicine from the University of Maryland Dental School in Baltimore, and his Doctor of Medicine in Dentistry (DMD) from the University of Pennsylvania School of Dental Medicine in Philadelphia.

112.    Relator is and has been at all material times a licensed dentist in the States of Wisconsin and Illinois and in the Commonwealth of Virginia.

113.    Relator is also a Diplomate of the American Board of Oral Medicine, a national examining board for oral medicinists, meaning that he has passed the certification exam administered by the Board.

114.    Per the American Board of Oral Medicine's website, an "oral medicine doctor is trained to diagnose and manage patients with disorders of the orofacial region," and "has received additional specialized training and experience in the diagnosis and management of oral mucosal abnormalities," such as ulcers, "salivary gland disorders, temporomandibular disorders … and facial pain, taste and smell disorders, and recognition of the oral manifestations of systemic and infectious diseases." *See* https://www.abomed.org/ (accessed October 7, 2025).

115.    Relator worked for Defendant LMG as an affiliate dentist and oral medicinist at TMJ, one Defendant 2626 Wauwatosa Ave, LLC's "Home Departments" from January 2019 through May 2025, under a five-year employment contract.

28

116.    In his capacity as affiliate dentist with Defendant LMG and working at the TMJ clinics that Defendant LMG operates as Defendant 2626 Wauwatosa Ave, LLC, he gained direct and independent knowledge of Defendants' *X-Ray Schemes*, *Unlicensed/Unsupervised Provider Scheme*, and *Self-Referral and Scheduling Scheme*, as well as of the broader *Conspiracy* to implement these schemes, by his personal observations with patients, staff and other providers; by reviewing internal documentation, including billing records to which he had limited access and of which he was informed by billing specialist Svetlana (or "Lana") Novakovich; and by his direct communications with Defendants Jay Mackman, Connor Peck, and Matthew Merlo, and others.

117.    Relator raised concerns about illegality and potential patient harm to Defendants Jay Mackman, Connor Peck, and Matthew Merlo, together and separately, in person and in writing, regarding *the X-Ray Schemes* in February 2023 and thereafter; regarding *the Unlicensed/Unsupervised Provider Scheme* early in his employment with Defendants and throughout said employment; and regarding *the Self-Referral and Scheduling Scheme* early in his employment with Defendants and throughout said employment.

118.    Relator told Defendants Jay Mackman, Connor Peck, and Matthew Merlo that he believed all these schemes were illegal; that his participation therein opened him to personal liability and professional censure; that patients could be and, in fact, were being harmed, medically and financially, by these Schemes; and that Defendants were defrauding the t\Taxpayers and the Government by implementing the Schemes.

119.    Defendant Jay Mackman, always with an eye on increasing revenue, and with plenty of experience in passing off fraud as common practice, dismissed Relator's opposition to the false claims out of hand, claiming that "everyone in the country" was doing what Defendants were doing, including at Defendant Stephen Harkins's Arizona practice, Defendant Harkins Group,

29

upon which Defendants Mackman, Connor Peck, and Matthew Merlo conspired with Defendant Harkins to model Defendants' own Scheme.

120. Defendant Connor Peck privately expressed misgivings about potential illegality to Relator on several occasions, as set forth in greater detail below, but nevertheless continued to participate in and to insist on the compliance of Defendants' employees, including Relator, with the Schemes.

121. The Wisconsin Defendants began counting the days until Relator's employment contract ended; Relator's employment with the Wisconsin Defendants ended in May 2025.

## B. Corporate Defendants

122. Defendant Jay Mackman incorporated Defendant LMG in May 1983; at all material times, LMG has been and is the *de jure* employer of all of the employees across the other named Wisconsin Corporate Defendants.

123. All employees of Defendant LMG's three (3) subsidiaries are employed by LMG; LMG handles their payroll and designates on their paystubs which of the subsidiaries is a given employee's "Home Department."

124. For example, Relator's paystubs indicate that he was employed by Defendant LMG directly and that TMJ (one arm of Defendant 2626 Wauwatosa Ave, LLC) was Relator's "Home Department."

125. Defendant LMG is the hands-on parent company of Defendant 2626 Wauwatosa Ave, LLC, which does business as Defendant TMJ and as Defendant Imaging Center.

126. TMJ provides dental and maxillofacial pain treatment and services, including the insertions and adjustments of Mandibular Advancement Devices ("MADs"), TMJ splints, and occlusal orthotics at the crux of *the Unlicensed/Unsupervised Provider Scheme*.

127. The Imaging Center provides radiology services, including to patients fraudulently self-referred from TMJ as part of *the Self-Referral and Scheduling Scheme* and in violation of the Stark Law, to support diagnoses and assist with coordination of care performed at TMJ, including the X-rays which were fraudulently coded and multiplicatively billed under *the X-Ray Schemes*.

128. Defendant LMG is the closely involved parent company also of Defendant Affiliated Health, a Wisconsin corporation founded by Defendant Jay Mackman in October 1984.

129. Defendant Affiliated Health provides physical therapy services, including to patients with the sorts of jaw, back, or neck pain treated at TMJ, who are internally self-referred to Defendant Affiliated Health in violation of the Stark Law under *the Self-Referral and Scheduling Scheme*.

130. Defendant LMG employs or employed the individual healthcare providers at Defendants Affiliated Health and 2626 Wauwatosa Ave, LLC, including at TMJ and the Imaging Center, who developed, facilitated, and carried out Defendants' schemes, including but not limited to the following:

    a. Defendant Jay Mackman as a dentist at TMJ;

    b. Defendant Connor Peck as a dentist at TMJ;

    c. Defendant Matthew Merlo as CEO and marketing and business development manager for Defendant LMG and all its Home Departments (Affiliated Health and 2626 Wauwatosa Ave, LLC);

    d. Defendant Debra Mackman as manager of Affiliated Health and of the Imaging Center and, in years past, as a physical therapist at Affiliated Health;

    e. Anna Fons as a nurse practitioner at TMJ;

31

f.      Svetlana Novakovich as billing specialist for LMG and as accounts receivable manager for Affiliated Health;

g.      Jodie Daley as a radiology technician for 2626 Wauwatosa Ave, LLC—that is, at TMJ and at the Imaging Center;

h.      Tammy Wesson as a radiology technician at the Imaging Center;

i.      Tracy Bolton as an advanced practice nurse at TMJ;

j.      Amanda Shear as a nurse practitioner at TMJ;

k.      Aaron Nisley as a dentist at Defendant TMJ; and

l.      Karien Bakker as a physical therapist at and director of Affiliated Health.

131.    Defendant Harkins Group, which is owned and managed by Defendant Stephen Harkins, provides treatment for neck, jaw, back pain and sleep apnea parallel to the treatment offered by Defendant TMJ, but on the State of Arizona.

### C.    <u>Wisconsin Corporate Defendants' Organizational Structure</u>

132.    Defendant LMG is the hands-on parent company of two subsidiaries: Defendant Affiliated Health and Defendant 2626 Wauwatosa Ave, LLC, which does business both as Defendant TMJ and as Defendant Imaging Center.

133.    Defendants Connor Peck and Matthew Merlo co-own Defendant LMG and its subsidiaries, meaning that all the Wisconsin Corporate Defendants (LMG, 2626 Wauwatosa Ave, LLC (d/b/a TMJ and d/b/a the Imaging Center) and Affiliated Health) are held under common ownership.

134.    All the Wisconsin Corporate Defendants' employees are employed and paid by Defendant LMG regardless of the "Home Department" where they actually perform work duties.

32

135.    Defendants Peck and Merlo co-manage the practices of Defendants TMJ, Affiliated Health, and the Imaging Center; Defendant Debra Mackman assists with the management of Defendants Affiliated Health and the Imaging Center.

136.    Defendant Matthew Merlo is the marketing and business development manager for all the Wisconsin Corporate Defendants; he collaborates with Defendants Connor Peck and Debra Mackman to increase the overall level of business at Defendants' practices and to increase the overall level of patient crossover between Defendants' Home Departments.

137.    Svetlana Novakovich is responsible for all billing at Defendant LMG, *including for services performed at all Defendants' "Home Departments"*; she processes and submits all claims for reimbursement for services performed at all of Defendants' practices, including the false coding and multiplicative billing at the heart of *the X-Ray Schemes*.

138.    All Wisconsin Corporate Defendants use the same common and connected computer system, equipped with WinDSX software, to coordinate patient care across practices and to make the internal self-referrals at the heart of *the Self-Referral and Scheduling Scheme*.

139.    The WinDSX software program allows Defendants to refer and schedule patients from one of LMG's Home Departments to another, e.g., to refer a patient who has a MAD inserted at Defendant TMJ for physical therapy for their jaws at Defendant Affiliated Health; it also allows Defendants to track the number of patients an individual healthcare provider refers, and the overall percentage of their clientele each healthcare provider refers from one LMG practice to another.

**D.    Individual Defendants**

140.    Defendant Jay Mackman is a dentist at Defendant TMJ and the original founder and owner of Defendant LMG and its subsidiaries. He received a bachelor's degree in pre-medical

33

studies from the University of Wisconsin at Madison and a Doctor of Dental Surgery (D.D.S.) from the Marquette University School of Dentistry in Milwaukee in 1981.

141. Defendant Connor Peck is a dentist at Defendant TMJ and the current co-owner, with Defendant Matthew Merlo, of Defendant LMG and its subsidiaries. He earned a D.D.S from the Marquette University School of Dentistry in Milwaukee in 2018 and conducted his residency at the University of Minnesota in the Twin Cities.

142. Defendant Matthew Merlo is the co-owner (with Defendant Peck), the CEO, and the marketing and business-development manager of Defendant LMG and its subsidiaries. He earned a bachelor's degree in business administration and management from Central Michigan University in Mount Pleasant in 1999.

143. Defendant Debra Mackman is the manager of Defendant Imaging Center and exercises control over Defendant Affiliated Health, where she was also once employed as a physical therapist. She holds a master's degree in physical therapy and a certification in craniofacial and cervical therapeutic therapy.

144. Defendant Stephen Harkins is a dentist at and the owner of Defendant Harkins Group in Tucson, Arizona. He received a bachelor's degree in molecular biology and genetics from the University of Wisconsin at Madison and a D.D.S. in orofacial pain and medicine from the University of Minnesota School of Dentistry in the Twin Cities, and he conducted mini-residencies at the University of California at Los Angeles School of Dentistry and Geffen School of Medicine.

## VII. DEFENDANTS' FRAUDULENT CONDUCT AND FALSE CLAIMS

### A. The X-Ray Schemes

145. Relator first became aware of Defendants' *X-Ray Schemes* in December 2022, when he was reviewing client billing and noticed serious discrepancies between the services

provided at Defendants' facilities and the billing claims and supporting documentation that were being submitted to Government healthcare programs based on those services.

146. In fact, these overcharges were the product of deliberate efforts by Defendants Jay Mackman, Merlo, Peck, and Debra Mackman to fraudulently increase the payments from Government healthcare programs to Defendant LMG through its "Home Departments."

147. A cone-beam computed tomography ("CBCT") machine scan, when utilized for diagnostic purposes, is reimbursed by the Government healthcare plans at an amount between $100.00 and $500.00. https://www.mavenimaging.com/blog/how-much-is-cbct-scan, accessed October 7, 2025.

148. Relator, however, noticed that Defendant LMG, through its billing specialist Svetlana Novakovich, was billing these images to Government healthcare programs for as much as $1,100.00, a clear overcharge made possible through knowing use of a false code.

149. The code LMG uses, CPT 70486, covers diagnostic scans performed using *medical-grade* CT machines; however, CBCT machines are distinct from medical-grade CT machines, and CBCT machine scan procedures are never reimbursable by the Government when used in dental practices.

149. To be sure, there are non-diagnostic benefits to the use of CBCT machines: Compared to medical-grade CT machines, they use less radiation, produce higher-resolution if less comprehensive images, render images more quickly, and are considerably cheaper and more compact.

150. That is, CBCTs have different associated medical uses than medical grade CTs: While medical-grade CTs are better for taking images of cancers, tumors, and growths, CBCTS

35

are ideal, for example, for inner-bone pathologies, i.e., *diagnoses* of conditions inside bony structures, which makes CBCTs very useful in dental practices.



*[Fig. 2: A demonstration of the individual images captured, and later reconstructed into a composite image, by a CBCT machine in X-raying a patient's jaws.]*

151. But CBCTs are less effective as *diagnostic tools* than are medical-grade CTs and so are not reimbursable by Government healthcare programs, especially when used in dental practices; see Figures 3 and 4, below, comparing the differing processes at work in medical-grade CT machines and CBCT machines.



*[Figs. 3-4: From left: A medical-grade CT machine and a CBCT machine.]*

36

152.     This is the crux of *the X-Ray False-Coding Scheme*: Defendants use CPT code 70486, which covers diagnostic *medical-grade* CT scans and *only* diagnostic medical-grade CT scans, to bill CBCT scans to the Government.

153.     CBCT machines and medical-grade CT machines are alike in that both make use of computerized tomography: taking a series of X-ray images, or "slices," and compiling those slices into a composite cross-section image of the body of the patient being scanned.

154.     This is the crux of *the X-Ray Multiple-Billing Scheme*: CBCT machines and medical-grade CT machines both take series of images and reconstruct them, as shown in Figure 5 below, which creates the opportunity for fraudsters to bill each slice of the ultimate composite image separately, as if multiple procedures were being conducted, when in fact only a single image procedure is performed.



*[Fig. 5: A textbook diagram and explanation of the mechanism of a medical-grade CT machine. The same basic principles of slicing and reconstructing are applicable to cone-beam CT machines.]*

155.     Therefore, Defendants fraudulently misrepresent both the nature of the procedure being performed in *the X-Ray False-Coding Scheme* and the volume of such procedures being

37

performed in *the X-Ray Multiple-Billing Scheme* by taking advantage of the mechanism by which the procedure at issue produces diagnostic results.

156. Through his conversations with Defendant Peck, both in-person and over text and email, Relator learned that Defendants Jay Mackman, Merlo, and Peck began conspiring with Defendant Harkins in January 2022 to increase the payments they could obtain from Government healthcare plans for X-ray services performed at Defendant Imaging Center, one arm of Defendant 2626 Wauwatosa Ave, LLC, and a "Home Department" of Defendant LMG.

157. On January 6, 2022, Defendant Peck sent a text message to Relator:

"We need better reimbursements and different ways to generate revenue for [sleep apnea] patients (x-ray, home monitoring, etc.). Otherwise its [*sic*] not worth it."

158. Defendant Jay Mackman and Defendant LMG's billing specialist Svetlana Novakovich both told Relator directly in January and February 2022 that Mackman, Novakovich, and Defendant Peck were meeting with Defendant Harkins with the express purpose of developing and implementing *the X-Ray Schemes* based on procedures and practices already in place at Defendant Harkins Group in Tucson, Arzona.

159. Beginning in at least early 2022 and continuing thereafter, Defendants Jay Mackman, Peck, and Merlo directly instructed Novakovich to submit these fraudulently coded and multiplicative claims to the Government for payment, with the additional direction from and assistance by Defendant Debra Mackman.

160. Relator became aware of Novakovich's role in the fraud because Defendants Jay Mackman and Peck directed Relator, as they did all other Providers employed by Defendant LMG across its Home Departments, to submit Relator's billing documentation to Novakovich so she, in

38

turn, could submit claims to the Government for payment, with the assistance and oversight of Defendant Debra Mackman.

161. Novakovich, who works for Defendant LMG and oversees billing across all its Home Departments, Defendants TMJ, Affiliated Health, and Imaging Center, told Relator in early 2022 that at Defendant Jay Mackman's direction and with Defendant Harkins as facilitator, she had met over the phone with her counterpart at Defendant Harkins Group in Tucson, Arizona, who demonstrated to Novakovich how to fraudulently code and multiplicatively bill a single non-diagnostic and non-medical grade CBCT scan as many as seven (7) or more times and then to submit corresponding claims to Government healthcare programs for payment multiple times over, using the false code CPT 70486.

162. Defendants Jay Mackman and Matthew Merlo collaborated with one another over email in early 2022 and continuing throughout 2023 to advance their *Conspiracy* to engage in the *X-Ray Schemes*, as directly witnessed by Relator and described in greater detail below.

163. On June 9, 2022, Aaron Nisley, then a dentist employed by Defendant LMG at Defendant TMJ, sent a text message to Relator to tell him that Defendants Peck and Debra Mackman were furthering the *Conspiracy* by increasing the level of internal referrals for patients at Defendant TMJ, that is, to increase the overall number of patients receiving services at multiple of Defendant LMG's Home Departments.

164. Patients who, for example, were treated or who sought treatment for sleep apnea at Defendant TMJ through the insertion and placement of a MAD should be referred to Defendant Affiliated Health for physical therapy to treat possible lingering pain and soreness from use of the device and to Defendant Imaging Center for imaging services.

39

165. Several times each month, Defendants Jay Mackman and Connor Peck instructed employees at Defendants TMJ, Affiliated Health, and Imaging Center, usually verbally, but also sometimes via email or text, to refer patients, often patients with sleep disorders or sleep apnea but especially (indeed, almost always) for patients with temporomandibular dysfunction or jaw pain, to Defendant Imaging Center for X-rays in order to advance *the X-Ray Schemes* and *the Self-Referral* and *Scheduling Scheme*, even when the referring providers knew the services were not reasonable or medically necessary for the patients being referred.

166. Technicians at Defendant Imaging Center, including Jodie Daley and Tammy Wesson, performed the radiology services, conducting the non-medical-grade, non-diagnostic CBCT machine scans that formed the basis of the fraudulent claims in *the X-Ray Schemes*.

167. Relator and other of Defendants' employees, including Aaron Nisley, Anna Fons, and Tracy Bolton, were instructed by Defendants Jay Mackman, Peck, and Merlo, often, many times each month, in verbal and written communications, to copy and paste readouts from the cone-beam CBCT machines used for imaging at Defendant Imaging Center to submit to Novakovich for billing.

168. Defendants' employees, including Fons, Bolton, Shear, and Nisley—and even Defendant Peck himself, who would go so far as to aretroactively copy-paste in his older cases after voicing ethical qualms earlier about doing so—engaged in this copying and pasting in order to provide Novakovich with false billing documentation that supported the fraudulent coding and multiplicative billing of the X-rays and the eventual submission of fraudulent claims for payment, as overseen by Defendant Debra Mackman.

169. Novakovich, in her capacity as billing specialist, would falsely code these CBCT scans using CPT code 70486, which covers only medical-grade CT machine scans.

170.    Novakovich would then submit seven (7) or more duplicative claims to the Government based on a single image, by splitting a claim for a single exposure into multiple claims, purportedly for multiple different exposures or "slices," each with their own supporting billing code, always knowing that the CPT 70486 code used was false when used for *any* CBCT scan, let alone one fraudulently sliced into multiple claims for payment to the Government.

171.    On July 7, 2022, Relator expressed his dissent to Defendant Jay Mackman's universal, mandatory directive to refer sleep-apnea patients at Defendant TMJ to Defendant Imaging Center for radiology services, sending a text message to Defendant Peck:

> " I'm not doing … routine CT scans for sleep apnea and [Defendant Jay Mackman] can relay to me directly any repercussions that may ensue from this style of practice."

172.    Using the software program WinDSX, Defendants Jay Mackman, Peck, and Merlo kept detailed records of the numbers and percentages of patients which Defendant LMG's employees were referring to and scheduling with Defendants Affiliated Health and Imaging Center to make *the X-Ray Schemes* and *the Self-Referral and Scheduling Scheme* as lucrative as possible.

173.    The Wisconsin Defendants wielded these internal referral metrics as an instrument of pressure, exclusion, and discipline.

174.    In 2023, Defendant Jay Mackman threatened to withhold work from employees, including Relator, who did not make satisfactory numbers of referrals to the others of Defendant LMG's Home Departments, and to direct new patients to providers who "closed" by referring patients in-house to Defendant Imaging Center for radiology services and to Defendant Affiliated Health for physical therapy.

174. In a text message sent on January 20, 2023, Defendant Peck instructed Relator to make his own records of the referrals he ordered:

> "[Aaron Nisley] and I have started tracking our internal PT/CBCT referrals [to Defendants Affiliated Health and Imaging Center, respectively] so we can compare. You should too, I'm happy to walk you through how."

175. Defendant Connor Peck demonstrated knowledge in this January 20, 2023 text of the pure profit motive for these self-referrals, entirely devoid of medical judgement, which supported the *X-Ray Schemes* and the *Self-Referral and Scheduling Scheme*: While Defendant TMJ was doing good business, Peck wrote, Defendant Jay Mackman insisted on "tag[ging] along PT and PMR to [Defendants Affiliated Health and Imaging Center] to inflate value."

176. Relator raised the specter of fraud inherent in the *X-Ray Schemes,* namely, the aforementioned false coding and multiplicative billing, to Defendants Jay Mackman, Peck, and Merlo in February 2023, telling them directly in a meeting in or around that time that the fraudulent coding and multiplicative billing could expose Defendant LMG and its Home Departments to FCA and Stark Law liability.

177. Defendant Jay Mackman dismissed Relator's concerns, telling him, "Everyone in the country is doing this," including, of course, Mackman's co-conspirator Defendant Harkins and his business, Defendant Harkins Group.

178. After Relator opposed the Stark and FCA liability initially, Defendant Peck doubled down, communicating in a group chat with Relator and Aaron Nisley that all participants in that conversation, including Peck himself, and indeed all of Defendant LMG's employees across its Home Departments, were expected to engage in this fraudulent, multiplicative billing as part of their employment responsibilities.

179.    On May 7, 2023, Relator again raised his concerns to Defendant Peck via a text message, writing:

> "I have existing reservations already on imaging: specifically how we code and bill dental CBCT [scans] as medical-grade CT [scans] and charge a lot more than current market rates for dental CBCT [scans].

180.    Defendant Peck confirmed to Relator by text message on May 9, 2023 that the ***X-Ray Schemes*** were being implemented pursuant to Defendants' broader ***Conspiracy,*** also expressing his knowledge of the dubious legality of the ***X-Ray Schemes*** and concern that his participation would open him, personally, to liability.

181.    "Lana [Novakovich]," Relator wrote in another May 2023 text message to Defendant Peck, "had talked to the billing chief" at Defendant Harkins Group, having been directed to do so by Defendants Jay Mackman and Harkins.

182.    "Right," Peck responded in May 2023 via text message, "so I believe Harkins does what we do. I just don't want to be personally liable if this is illegal," describing ***the X-Ray Schemes*** as rife with "sketchiness."

182.    On May 14, 2023, Defendant Peck sent a text message to Relator and Aaron Nisley together, stating:

> "I think we need to meet as doctors with Jay [Mackman] about the X-ray codes, because I have doubts about them. I haven't heard ... about how Harkins is doing it."

184.    Relator responded the same day to Defendant Peck's text message, writing: "Jay [Mackman] told me yesterday we should perform and bill CBCT for all [obstructive sleep apnea]

43

cases otherwise it's malpractice. I told him it's not and even if we wanted to image everyone," it would not be found as medically necessary so as to justify reimbursement.

185. Defendant Peck then again made reference to the ***Conspiracy*** in his responsive text message:

> "Harkins formula [*sic*] seems similar to ours. When the Xray [*sic*] drama began, Jay [Mackman] had Lana [Novakovich] talk to Harkins and their billing lead.

186. In a May 15, 2023 group text message to Relator and Defendant Peck, Aaron Nisley endorsed Relator's concerns about the illegality of the ***X-Ray Schemes*** and recapitulated those concerns in list form:

> "1) cone beam CT is not the same as medical CT. A procedural concern
>
> 2) submitting slice after slice for individual images when there is a single more appropriate code doesn't seem right."

187. On May 17, 2023, Defendant Peck sent a test message to Relator and Aaron Nisley to confirm that the purpose of the ***X-Ray Schemes*** was the "obviously better reimbursement," and to cite also as a benefit of the ***Schemes*** the comparative ease with which CBCT-scan claims could be processed under code CPT 70486.

188. Relator responded via test message on the same day, "I just don't know if we're in Compliance [*sic*] coding multiple codes [for individual X-rays] like we do. Only [Jay Mackman] and [Stephen] Harkins seem to [think] so."

189. The next day, May 18, 2023, Relator sent a text message to Defendant Peck and Aaron Nisley to inform them that Defendant Jay Mackman had once again defended the ***X-Ray Schemes*** to Relator:

44

"I heard justifications over lunch how our numerous codes for numerous slices are okay. The explanations are still unclear especially as I pointed out that medical insurances don't reimburse much for dental CBCT when done in dental or OMFS offices (70486 maxillofacial CT)."

190. On May 25, 2023, Relator sent a text message to Aaron Nisley and Defendant Peck:

"I reached out to a medical Radiologist from California … They don't think copy pasting [using the beam readouts from the CBCT machine as if the ordering dentists had composed them themselves] "for purpose of billing insurance is okay."

191. Defendant Peck once again expressed fear of retribution for his participation in the **Schemes** in a text message to Relator and Aaron Nisley on May 31, 2023:

"I would rather do things the right way, … than get busted for fraudulent billing in ten years."

192. Nevertheless, the fraudulent **X-Ray Schemes** continued unabated.

193. On June 11, 2023, Relator wrote to Defendant Peck and to Aaron Nisley, explaining that the *X-Ray Multiple-Billing Scheme* was unlawful, stating:

"7 codes for 7 slices does not seem to be the norm."

193. Internal communications between Defendants Jay Mackman, Peck, and Merlo reveal that all three men had actual knowledge of the illegality of their false claims and of Relator's attempts to stop the false claims.

194. In a July 17, 2023 email to Jay Mackman and Peck, Merlo wrote:

"Desai will be a thorn in the businesses [*sic*] side for the next 1.5 years [until his employment contract ends]."

45

194. Further demonstrating Defendants' knowledge of the unlawfulness of the **X-Ray Scheme** are the records of a July 2023 meeting between Defendants Jay Mackman, Peck, Merlo and Ebix Consultant Deena Wojtkowski, a third-party Medicare billing exert.

195. Defendants met with Wojtkowski in pursuit of her affirmation that the **X-Ray Scheme** was lawful, but Wojtkowski instead confirmed in no uncertain terms that the Defendants' X-Ray Schemes were fraudulent.

196. Wojtkowski memorialized the opinions she offered to Defendants in a letter in July 2023, informing them that:

   a. the *X-Ray Multiple Billing Scheme* was expressly unlawful; and

   b. the CPT code 70486 is associated with scans performed using medical-grade CT machines, not the CBCT machines in use at Defendant Imaging Center, and thus that Defendants' *X-Ray False Coding Scheme*, also, was expressly unlawful.

197. Relator became aware of Wojtkowski's meeting with and subsequent letter to Defendants when Defendants Jay Mackman and Peck informed him directly about it, and later when Wojtkowski independently informed Relator of the meeting and the letter in her later capacity as a billing specialist working with Relator at the practice he established after leaving Defendants' employ.

198. After their meeting with Wojtkowski, in or around August 2023, Defendants may have ceased *the X-Ray Multiple-Billing Scheme*, but continued to implement *the X-Ray False-Coding Scheme*, that is, to use CPT code 70486 for CBCT scans despite direct and actual knowledge that to do so constitutes the submission of a false claim to the Government for payment.

46

200. In August 2023, using their Gmail accounts, Defendants Jay Mackman, Peck and Merlo communicated with one another to discuss how they sought to increase the Wisconsin Corporate Defendants' revenue using the **X-Ray Schemes**.

201. In their email thread, these Defendants concurred that *every* patient treated by Defendants for sleep apnea would be referred to and scheduled with Defendant Imaging Center for CBCT scans, even when such was not medically necessary.

202. In addition, in the same Gmail thread, these three Defendants concurred that Relator was likely to be a "conscientious objector" to *the X-Ray Schemes.*

202. On August 23, 2023, Relator sent a text message to billing specialist Novakovich to inform her that using CPT "70486 may be a problem … Even UHC isn't covering it."

203. In a December 2023 email chain, Defendants Jay Mackman, Peck, and Merlo expressed their intent to use fraudulently billed X-rays conducted through internal *Self-Referral and Scheduling Scheme* as a "moneymaker" to ramp up Defendant LMG's practice and to facilitate their plans to expand the practice, directly demonstrating their knowledge of the illegality of the *X-Ray Schemes* and their intent to defraud the Government through their *Conspiracy* to implement the *Schemes*.

B. **The Unlicensed/Unsupervised Provider Scheme**

204. Relator first gained direct knowledge of Defendants' *Unlicensed/Unsupervised Provider Scheme* early in his employment as he witnessed practitioners performing dental procedures inconsistent with and beyond the scope of their licensure, but his fears were crystallized in summer 2024, when Anna Fons began working for Defendant LMG as a nurse practitioner at Defendant TMJ.

47

205. Defendants Peck and Jay Mackman trained Fons to perform her mandatory duties as an LMG employee during the first two weeks of her employment at Defendant TMJ.

206. After Defendants Peck and Jay Mackman ceased training Fons, Relator personally observed Fons and other LMG employees routinely performing procedures to insert, fit, and adjust mandibular advancement devices ("MADs"), TMJ splints, and occlusal orthotics for patients despite these LMG employees not being trained or licensed as a dentist or even being supervised by a licensed dentist, in direct and knowing violation of Wis. Stats. chs. 441, 447.

207. Improper placement or adjustment of these devices can and sometimes does lead to *permanent adverse changes to a patient's facial structure and bite as well as chronic pain and discomfort,* especially if a MAD is not "provided by qualified dentists who have had appropriate training in the field." Shadi Basyuni *et al*., "An update on mandibular advancement devices for the treatment of obstructive sleep apnea hypopnea syndrome," 10 *J. Thoracic Disease* (Jan. 24, 2018), https://jtd.amegroups.org/article/view/17794/14522 (accessed October 17, 2025).

209. After Relator observed Anna Fons and others practicing dentistry without proper licensure or supervision, he observed many more practitioners, including Tracy Bolton and Amanda Shear, doing the very same despite not being licensed dentist or being supervised by a licensed dentist.

210. The difference in training time for a nurse practitioner and for a dentist performing *any* dental work is the difference between *weeks* and *years* of training.

211. Defendants Jay Mackman, Peck, and Merlo directed Fons, Bolton, Shear and other non-dentists to engage in the unlicensed, unsupervised practice of advanced dentistry, specifically the insertion, fitting, and adjusting of MADs.

48

212. Defendants Jay Mackman and Peck directly informed Relator, and virtually all others of Defendants' employees, that nurses and nurse practitioners, including Fons, Bolton, and Shear, were practicing dentistry without licensure or supervision and performing procedures far beyond their competence which only dentists are licensed to perform.

213. Indeed, Defendant Peck made clear to Relator long before Anna Fons began working for Defendants that Peck knew that only dentists could legally perform MAD-related procedures.

214. In a text message sent to Defendant Peck on December 1, 2022, Relator wrote, "Dentists are still not allowed to practice certain ways and make certain diagnoses …. A question remains would dental boards be okay with non-dental MD's inserting oral appliances?"

215. Defendant Connor Peck responded, "Dental boards obviously would prefer dentists make oral appliances, I would too. … I don't know what needs to happen to prevent MDs from making appliances."

216. Nevertheless, MAD procedures were then and continue now to be conducted by providers in Defendants' employ without proper licensure or supervision by a licensed dentist.

217. Relator raised his concerns to Defendant Jay Mackman about ***the Unlicensed/Unsupervised Provider Scheme*** soon after discovering it in summer 2024, asking simply if what Relator had observed was permissible, and whether Defendants had knowledge of the situation.

218. Defendant Jay Mackman told Relator repeatedly in person, at this time and others, "It's fine. Everyone else is doing it."

219. That is, Defendants had direct knowledge of the situation and its illegality but brushed off Relator's concerns by asserting that Defendants were merely a few among a great

49

many providers engaging in brazen violations of the law, despite the known and obvious falsity of such claims.

220. Claims for these unlawful procedures were submitted by Defendants to the Government for payment, including claims regarding the care of:

    a. **Medicare Beneficiary R.L.T.** from whom Relator received a complaint in summer 2025 about her MAD that had been improperly inserted by a TMJ provider who was neither a licensed dentist nor supervised by a licensed dentist; and

    b. **Medicare Beneficiary L.D.** from whom Relator received a complaint at his solo practice in summer 2025 about her MAD that had been improperly inserted, by a TMJ provider who was neither a licensed dentist nor supervised by a licensed dentist.

### C.    <u>The Self-Referral and Scheduling Scheme</u>

221. From the earliest days of his employment with Defendants, Relator developed concerns as to what appeared to him to be impermissible self-referrals between Defendant LMG's "Home Departments," in violation of the Stark Law.

222. Relator gained knowledge in 2019, within the first few months of working for LMG, that Defendant Jay Mackman, then the owner of Defendant LMG and its Home Departments, Defendants Affiliated Health, Imaging Center, and TMJ, had a direct financial relationship with those entities and stood directly to benefit from internal self-referrals and scheduling between the Home Departments.

223. Relator therefore knew when Defendants Peck and Merlo became co-owners of Defendant LMG and its Home Departments in May 2025 that they stood directly to benefit from

self-referrals and scheduling between the Home Departments in precisely the same manner as did Defendant Jay Mackman during his ownership tenure.

224. On information and belief, Defendant Jay Mackman's agreements with the new co-owners, Defendants Merlo and Peck, continued his financial rewards from LMG's revenue growth.

224. Defendants Peck, Merlo, and especially Jay Mackman directed Defendants' employees, including Relator, to refer and directly schedule treatments for patients from Defendant TMJ to Defendant Affiliated Health for physical therapy services and to Defendant Imaging Center for radiology services, even when the referring Providers had knowledge that such services were patently medically unnecessary given the medical needs of the patients being referred.

225. Defendants Jay Mackman, Peck, and Merlo exhorted their employees many times each month, indeed, sometimes many times each week, to make these referrals, and regularly verbally reprimanded employees who were not doing so.

226. Defendant Jay Mackman oversaw the installation, before Relator's employment with Defendants began, of a third-party software program, WinDSX, which Defendants' practices used to track and make referrals between the Home Departments as well as to calendar procedures with Providers.

227. Using WinDSX software, Defendants Jay Mackman, Peck, and Merlo tracked and maintained internal records of which of Defendants' employees were making the greatest number of referrals and referring the highest percentage of their clientele to Defendants Affiliated Health and Imaging Center, that is, making the greatest number and the highest percentage of in-house referrals, for physical therapy services and radiology services, both of which are categorized as "designated health services" by and unlawful referrals to both of which are prohibited by the Stark Law, 42 U.S.C. § 1395nn(h)(6).

51

228. Defendant Peck reported that he was keeping track of his own referral statistics and he directed Relator to do the same in a text on January 20, 2023.

229. Defendants' managers, including Brad Ilk and Pascalle Dumez, among others, produced WinDSX software reports each month for Defendant Jay Mackman to keep track of how many patients were being referred from Defendant TMJ to Defendants Affiliated Health and Imaging Center.

230. Further, Defendant Jay Mackman would personally reach out to Providers whose referral numbers were unsatisfactory to him to reprimand and redirect them to increase their referrals within the LMG entities.

231. Indeed, in the summer of 2023, Defendant Jay Mackman threatened to withhold work or actually withheld work from those of Defendants' employees whose internal referral numbers were deemed unsatisfactory, and to direct patients and work, i.e., to mete out rewards, to those of Defendants' employees who "closed" and made the most in-house referrals.

232. Defendant Peck expressed his knowledge that *the Self-Referral and Scheduling Scheme* was illegal, writing in 2023:

"Our owner's [Jay Mackman's] approach to patient care and communicating with doctors is not patient-focused but entirely financially driven, to the extent that he has suspended a doctor from practicing for an entire month because his 'closing rate'"—i.e., the percentage of this doctor's patients who were being referred in-house in violation of the Stark Law—"was too low. [Mackman] has begun to dissect our 'closing rates' and our percentages of referrals to get imaging and PT internally. He has threatened to direct new patients to the providers who 'close' and refer in-house."

233. Receptionists at Defendants Affiliated Health and Imaging Center, under the supervision of and with the assistance of Defendant Debra Mackman, used the WinDSX software to schedule appointments for patients referred by Defendant TMJ upon notification of referral, through the shared WinDSX software, from providers at TMJ.

234. Defendant Debra Mackman oversaw referrals to and provided management support for Defendants Affiliated Health and Imaging Center.

235. Defendant Debra Mackman also personally trained employees, including Imaging Center technicians Jodie Daley and Tammy Wesson, to take the scans which supported the *X-Ray Schemes* and the *Self-Referral and Scheduling Scheme*, despite Debra Mackman's lack of professional licensure in radiology services.

236. Defendant Debra Mackman also personally trained physical therapists at Defendant Affiliated Health and provided management support to staff there in coordinating patient referrals from other Home Departments using their shared WinDSX software.

237. This use of WinDSX software to coordinate impermissible in-house referrals was a universal practice; there were no instructions given to Providers to implement this *Scheme* on a patient-by-patient basis based on medical judgment.

238. However, Defendants Jay and Debra Mackman, Peck, and Merlo engaged in a *Conspiracy* among themselves by which they oversaw compliance with and enforcement of this *Scheme*.

239. On June 13, 2023, Defendant Jay Mackman went so far as to demand that every single patient treated at Defendant TMJ for sleep issues, including the obstructive sleep apnea often treated at TMJ with use of a mandibular advancement device, must be referred to Defendant

53

Imaging Center and scheduled to receive imaging services there without regard to medical necessity or reasonableness.

240. Defendant Jay Mackman claimed that this was "the standard of care" and that Ebix Consultant Deena Wojtkowski had endorsed the practice, as Relator reported in a text to Defendant Peck and Aaron Nisley: "Jay walked in saying Deena [Wojtkowski] wants us to do Xrays [*sic*] on all sleep patients as that's the standard of care."

241. This assertion, of course, was doubly wrong: Wojtkowski confirmed later to Relator that she had said no such thing, and the American Academy of Dental Sleep Medicine Qualified Dentists, a professional organization regulating dentists who treat snoring and sleep apnea, does not, in fact, consider mandatory CBCT scans necessary in all cases; in-laboratory polysomnography is the most common diagnostic tool for diagnosis of obstructive sleep apnea. "Applications of CBCT Technology in Dentistry," *Dental Sleep Practice* (accessed October 17, 2025), https://dentalsleeppractice.com/applications-cbct-technology-dentistry.

242. In engaging in their *Conspiracy* to implement *the Self-Referral and Scheduling Scheme*, Defendants Jay and Debra Mackman, Peck, and Merlo thwarted the purpose of the Stark Law, *to protect patient choice in healthcare from the corrupting influence of financial incentives*, *see e.g.* 66 Fed. Reg. 856 (Jan. 4, 2001), and thereby violated the conditions of their participation in Government healthcare programs, including Medicare and Medicaid. 42 U.S.C. §§ 1395nn(g)(1), 1396b(s).

243. Defendants regularly preauthorize and schedule patients at Defendant TMJ for CBCT scans at Defendant RDIC *before patients even walk in the door*; one such patient, **C.C.**, told Relator on November 7, 2025 that before she even went to her appointment at Defendant TMJ, she got a letter preauthorizing her for a CBCT scan, in direct contravention of expert billing advice

provided by Deena Wojtkowski to Defendants Peck, Jay Mackman, and Matthew Merlo in July 2023.

244. Defendants regularly submitted claims for these illegal in-house referrals to the Government for payment, including claims regarding the care of:

      a.      **Medicare Beneficiary L.V.,** who was referred by Relator from Defendant TMJ to Defendant Imaging Center for X-rays in or around summer 2022;

      b.      **Medicare Beneficiary L.H**., who was referred by Relator from Defendant TMJ to Defendant Affiliated Health for physical therapy and to Defendant Imaging Center for radiology services in or around summer 2022;

      c.      **Medicare Beneficiary D.S**., who was referred by Relator from Defendant TMJ to Defendant Affiliated Health for physical therapy and to Defendant Imaging Center for radiology services in or around late 2023 or early 2024; and

      d.      **Patient Beneficiary J.N.,** who was referred by Relator from Defendant TMJ to Defendant Affiliated Health for physical therapy in or around late 2023 or early 2024.

**D.**      <u>**The Overpayment Retention Scheme**</u>

      **a.**      **The X-Ray Schemes**

245. During the time in which Defendants engaged in the *X-Ray Schemes*, multiplicative billing was a universal practice across Defendant LMG's Home Departments.

246. Indeed, Defendant Jay Mackman praised Defendant Peck in April or May 2025 for his compliance with the *X-Ray Schemes*, as witnessed by Relator directly.

247. Every patient who received X-ray services at Defendant Imaging Center while the *Schemes* were in place had their claims falsely coded, multiplicatively billed, and submitted to the

Government by Defendants for payment, through billing specialist Svetlana Novakovich as supervised by Defendant Debra Mackman, resulting in massive Government overpayments to which Defendants were not, and knew they were not, entitled.

248. On July 20, 2023, for example, Deena Wojtkowski provided her professional billing advice to Defendants Peck and Merlo over email that:

> "for governmental payors, once you realize an error, you are required to act on it and make corrections within 60 days of discovery.

249. During all relevant times, Defendants had knowledge that the *X-Ray Schemes* resulted in their submitting claims to the Government for reimbursement which were based on material misrepresentations and that the resulting claims were therefore fraudulent and yet did not report nor return any resulting overpayments.

### b. The Unlicensed/Unsupervised Provider Scheme

250. During all relevant times, Defendants had knowledge that ***the Unlicensed/Unsupervised Provider Scheme*** resulted in their submission of claims to the Government for payment which were based on material misrepresentations of compliance with Wisconsin law, and that such claims were therefore false under the FCA.

251. Defendants neither reported nor returned any and all overpayments resulting from their implementation of ***the Unlicensed/Unsupervised Provider Scheme***, despite clear knowledge of their obligation to do so.

### c. The Self-Referral and Scheduling Scheme

252. During all relevant times, Defendants had knowledge that through ***the Self-Referral and Scheduling Scheme***, they were submitting claims to the Government for payment which were based on fraudulent, material misrepresentations, i.e., the representation that there was

no illegal financial relationship by which Defendants Jay Mackman, Peck, and Merlo stood to profit from these referrals.

253. On April 5, 2023, Relator put Defendant Peck on direct, actual notice of the fraudulent nature of this Scheme: "Just realized," Relator wrote, "that overbooking physical therapy comprises Medicare fraud."

254. On July 27, 2023, Deena Wojtkowski told Defendants Peck, Merlo, and Jay Mackman that preauthorizing services was expressly unlawful: "You must do an initial visit with a patient in order to determine if a patient will require some sort of device to be fitted. ... The providers *[sic]* advice and/or opinion is required...."

255. That is, Wojtkowski made clear to these three Defendants that making referrals in the absence of reason and medical necessity was expressly unlawful.

256. Nevertheless, Defendants neither reported nor returned any of the known overpayments resulting from their implementation of *the Self-Referral and Scheduling Scheme*, despite clear knowledge of their obligation to do so.

## E. Conspiracy

### a. The X-Ray Schemes

257. As described in greater detail above, Defendants Jay and Debra Mackman, Peck, Merlo, and Harkins engaged in a *Conspiracy* to develop and implement the *X-Ray False-Coding Scheme* and the *X-Ray Multiple-Billing Scheme*.

258. Defendants Jay and Debra Mackman, Peck, and Merlo conspired to identify ways to maximize Defendants' profits through false claims to Government payors, including through internal marketing to existing patients without regard to medical judgment.

259. Defendants Jay Mackman, Peck, and Merlo regularly exchanged emails discussing and advancing the *Conspiracy* to develop, in coordination with Defendant Harkins, the *X-Ray Schemes*, and then to implement it at Defendants LMG, TMJ, Affiliated Health, and Imaging Center.

260. Defendants Jay Mackman, Peck, and Merlo directed Providers, including Relator, to schedule as many X-rays as possible in order to maximize the volume of false claims submitted to Government payors.

261. Defendant Debra Mackman, despite her lack of licensure in radiology services, trained staff at Defendant Imaging Center, including Tammy Wesson and Jodie Daley, on how to take the X-rays upon which Defendants' false claims were based.

262. Defendants Jay Mackman, Peck, and Merlo directed Providers, including Relator, to use pre-written claim descriptions from BeamReaders to better facilitate the submission of false claims.

263. Defendants Jay Mackman and Peck personally made use of these pre-written claim descriptions from BeamReaders to support the submission of false claims based n their own work.

264. Defendant Jay Mackman directed billing specialist Svetlana Novakovich to falsely code and bill multiplicatively for the resulting X-rays.

265. Defendant Jay Mackman conspired with Defendant Harkins to model the fraud to be perpetrated at Defendant LMG on the fraud being perpetrated at Defendant Harkins Group, and arranged for LMG billing specialist Svetlana Novakovich to receive training from her Harkins Group counterpart on how to conduct the false coding and duplicative billing.

266. Defendants Jay Mackman, Peck, and Merlo kept track of how many X-rays each Provider was ordering and gave incentives to Providers with the best numbers and percentages.

58

267. Defendant Merlo, per an email he sent to Defendant Peck on July 12, 2023, was responsible for "coordinat[ing] and document[ing] recredentialing" Defendants' practices "with Network Health," i.e., Merlo was actively involved in the manner of Defendants' submissions of claims for reimbursements to insurance providers.

268. Defendants Jay Mackman and Peck personally engaged in the *X-Ray Schemes*, submitting documentation of X-ray services ordered at Defendant TMJ and performed at Defendant Imaging Center to billing specialist Svetlana Novakovich with express knowledge that this documentation was false and would result in the submission of false claims.

### b. The Unlicensed/Unsupervised Provider Scheme

269. As described in greater detail above, Defendants Jay Mackman, Connor Peck, and Matthew Merlo engaged in a *Conspiracy* to develop and implement *the Unlicensed/Unsupervised Provider Scheme*.

270. Defendants Jay Mackman and especially Peck personally trained many of the providers, including Anna Fons, Tracy Bolton, and Amanda Shear, who provided the relevant procedures without proper licensure or supervision.

271. In their capacity as managers of Defendant TMJ, Defendants Jay Mackman and Peck oversaw, facilitated, and condoned the unlicensed and unsupervised practice of dentistry with full knowledge that such was illegal.

272. During all relevant times, Defendants Jay Mackman, Peck, and Merlo knew that the procedures being performed could not legally be performed without, at the very least, the supervision of a licensed dentist, and yet did not take any ameliorative action to ensure compliance with Wis. Stats. chs. 441 and 447 despite clear knowledge of their noncompliance and its materiality to the false claims they were submitting for reimbursement to the Government.

59

c.      The Self-Referral and Scheduling Scheme

273.    As described in greater detail above, Defendants Jay and Debra Mackman, Peck, and Merlo engaged in a *Conspiracy* to develop and implement the *Self-Referral and Scheduling Scheme*.

274.    Until May 2025, Defendant LMG and its Home Departments were all under the common ownership of Defendant Jay Mackman, giving him a direct and impermissible financial relationship with each Home Department through which he stood personally to benefit from in-house referrals violative of the Stark Law.

275.    Since May 2025, Defendants Peck and Merlo have held Defendant LMG and its Home Departments under common ownership, giving them both a direct impermissible financial relationship with each Home Department through which they stand personally to benefit from in-house referrals violative of the Stark Law.

276.    On information and belief, Defendant Jay Mackman continues to profit from increased revenues at the Wisconsin Corporate Defendants and their Home Departments.

277.    As owner, Defendant Jay Mackman oversaw the installation of the WinDSX program to facilitate in-house referrals and scheduling between Defendants TMJ, Affiliated Health, and Imaging Center.

278.    Defendants Jay Mackman, Peck, and Merlo used the WinDSX program to track the numbers and percentages of patients being referred in-house; not only did they benefit personally from greater numbers and percentages of referrals, but they rewarded the providers in their employ who returned the best numbers with access to work.

279.    Defendant Jay Mackman insisted as a matter of policy that all patients treated at Defendant TMJ for sleep apnea be referred to Defendant Imaging Center for radiology services,

regardless of whether such services were reasonable and medically necessary for those patients referred, and indeed often with knowledge that such services were neither reasonable nor medically necessary in a given case.

280. Defendant Peck personally encouraged Defendants' employees, including Relator, to maintain records of their referrals in an effort to incentivize them to make greater numbers of referrals and to refer a higher percentage of their overall clientele.

281. Defendant Merlo presided over efforts to market in-house referral services to existing patients and to induce repeat visits, per an email Merlo sent to Defendant Peck on July 12, 2023 citing follow-ups "with referral sources, clinic managers, [and] referral coordinators" as one of Merlo's core duties.

282. Defendant Debra Mackman oversaw referrals and scheduling at Defendants Affiliated Health and Imaging Center using the WinDSX program to facilitate the *Scheme*.

283. Defendant Debra Mackman, in coordination with Defendants Jay Mackman, Peck, and Merlo, assisted support staff at Defendants Affiliated Health and Imaging Center with making and scheduling in-house referrals.

## VIII.  WISCONSIN DEFENDANTS' RETALIATION AGAINST RELATOR

284. Defendants, especially Individual Defendants Peck, Jay Mackman, and Merlo, repeatedly targeted Relator for retaliation because of Relator's lawful efforts to attempt to stop Defendants' fraudulent **Schemes**.

285. After Relator began bringing the illegality of their false claims to Defendants Jay Mackman, Peck, and Merlo in 2023, the latter three men began conspiring to retaliate against Relator.

286. When Relator began working for Defendant LMG, Defendant Jay Mackman communicated to Relator that Relator was on track to become a part owner of Mackman's practices; Defendant Peck received similar assurances.

287. Once Relator began opposing Defendants' fraudulent schemes, Defendant Jay Mackman took the promise of potential ownership off the table, depriving Relator of significant economic benefit in so doing.

288. Because of Peck's willingness to further Defendants' existing **Schemes** and his relentless attempts to stop the false claims, Peck and Merlo secured an inside track to become owners of Defendants' practices.

289. On July 11, 2023, Defendants Jay Mackman, Peck, and Merlo met with Mackman's attorney, Charles Vogel, to discuss how Relator had positioned himself in opposition to their **Schemes**; the next day, Jay Mackman, Peck and Merlo circulated a memo about Relator.

290. On July 14, 2023, Defendants Jay Mackman, Peck, and Merlo met with Relator to discuss Relator's opposition to the Wisconsin Defendants' **Schemes**.

291. Defendant Peck's contemporaneous notes from this July 14 meeting report that Relator "interviewed numerous previous employees ... who have provided written concerns about the practice."

292. In this meeting, Defendant Jay Mackman directly instructed Relator not to put his nose where it didn't belong: "Jay clarifie[d] Bhavik's role is to provide patient care, not stir up staff," per Defendant Peck's notes.

293. Just a few days later, on July 17, 2023, Defendants Jay Mackman, Peck, and Merlo again met to discuss Relator's opposition to false claims and his related future employment.

294. Defendant Merlo wrote in an email after this meeting:

62

"As Leaders we MUST acknowledge Desai will be a thorn in the businesses *[sic]* side for next 1.5 years regardless [sic] decision made."

295. Defendant Peck had repeated this "thorn in side" language to Relator throughout Relator's employment; Peck would excoriate Relator in these terms at least once a month from late 2022 into spring and summer of 2023.

296. This email also sees Defendant Merlo openly contemplating firing Relator or otherwise forcing him out because, if Defendants did not fire Relator or force him out, "he [would] still work to undermine the company."

297. On July 25, 2025, Defendant Merlo wrote of Relator in an email to Defendant Peck and to attorney Charles Vogel, "We want him out!!"

298. Attorney Charles Vogel drew up draft terms of separation for Relator to leave Defendants' employ in August 2023.

299. Defendant Jay Mackman presented these terms to Relator in a letter in August 2023; however, Mackman withdrew the letter and chose to retain Relator then because many employees had separated from their employment with Defendants around that time and Mackman needed Relator to help accommodate the volume of patients at Defendants' practices.

300. Defendant Peck received other privileges, too, which were denied Relator on the basis of Relator's opposition to Defendants' Schemes and peck's support thereof: Peck was sent, expenses paid, to a medical conference to take continuing education courses; Relator was not even *informed* that this was taking place, let alone given the option to attend.

301. Relator remained employed with Defendant LMG at Defendant TMJ until May 2025, when Defendant Jay Mackman gave public notice that he was selling his practices to Defendants Peck and Merlo.

302. Given his dealings with Defendants Peck and Merlo, Relator knew that with those two men at the helm, continuing to work for Defendant LMG would require him either to assist in the implementation of Defendants' **Schemes** or, at the very least, to become complicit therewith.

303. Defendant Jay Mackman announced the sale on May 8, 2025; Relator's last day working at Defendant LMG was May 9, 2025.

304. Throughout his employment after he initially attempted to stop the Wisconsin Defendants from submitting false claims to Government payors and to withhold overpayments, the Wisconsin Defendants discriminated against Relator with regard to his compensation and other rewards, duties, and employment status.

305. But for the Wisconsin Defendants' insistence on Relator participating in the submission of false claims to government payors and Relator's refusal to do so and his attempts to stop the false claims, Relator was on track to and would have become a co-owner of LMG.

## IX. COUNTS

### COUNT ONE

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

**The X-Ray False-Coding Scheme**

273. Relator realleges and incorporates by references the allegations of all previous paragraphs as if such were restated herein.

274. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

275. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable under the Act.

276. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for medical services in violation of 31 U.S.C. § 3729(a)(1)(A).

277. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay reimbursements on claims that would not be reimbursable, or would be reimbursable only at lower rates, but for Defendants' illegal conduct.

278. By reason of Defendants' acts, the Government has suffered substantial actual damages.

## COUNT TWO

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### The X-Ray Multiple-Billing Scheme

279. Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

280. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

281. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable under the Act.

282. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for medical services in violation of 31 U.S.C. § 3729(a)(1)(A).

283. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay reimbursements on claims that would not be reimbursable, or would be reimbursable only at lower rates, but for Defendants' illegal conduct.

284. By reason of Defendants' acts, the Government has suffered substantial actual damages.

## COUNT THREE

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

### The Unlicensed/Unsupervised Provider Scheme

285. Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

286. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

287. Under 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable under the Act.

288. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for medical services in violation of 31 U.S.C. § 3729(a)(1)(A).

289. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay reimbursements on claims that would not be reimbursable, or would be reimbursable only at lower rates, but for Defendants' illegal conduct.

290. By reason of Defendants' acts, the Government has suffered substantial actual damages.

## COUNT FOUR

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

**Falsification of Documentation**

291. Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

292. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

293. 31 U.S.C. § 3729(a)(1)(B) states that "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the Act.

294. By engaging in the conduct set forth herein, Defendants have knowingly made, used, or caused to be made or used false records or statements material to their false and fraudulent claims as described herein.

295. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay reimbursements on claims that would not be reimbursable, or would be reimbursable only at lower rates, but for Defendants' illegal conduct.

296. By reason of Defendants' acts, the Government has suffered substantial actual damages.

## COUNT FIVE

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

### Retention of Overpayments (Reverse False Claims)

297. Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

298. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

299. 31 U.S.C. § 3729(a)(1)(G) states that "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transit money or property to the Government" is liable under the Act.

300. By engaging in the conduct set forth herein, Defendants have knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money or property to the Government.

301. By engaging in the conduct set forth herein, Defendants have knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

302. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has been denied restitution for overpayments of which it would have regained possession, but for Defendants' fraudulent conduct.

303. By reason of Defendants' acts, the Government has suffered substantial actual damages.

68

## COUNT SIX

### Violations of the Stark Law, 42 U.S.C. § 1395nn(a)(1)(A)-(B)

### The Self-Referral and Scheduling Scheme

304.    Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

305.    This is an action for civil monetary penalties under the Stark Law, 42 U.S.C. § 1395nn.

306.    42 U.S.C. § 1395nn(a)(1)(A)-(B) states that "if a physician (or an immediate family member of such physician has a financial relationship" encompassed by 42 U.S.C. § 1395nn(a)(2), "the physician may not make a referral to the entity for the furnishing of designated health services for which payment" may be made under a federally funded healthcare program, and that "the entity may not present or caused to be presented a claim" under Medicare "to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under" the Stark Law.

307.    By engaging in the conduct described herein, Defendants have engaged in and continue to engage in violations of the Stark Law.

308.    By reason of Defendants' acts, Defendants are liable for civil monetary penalties under the Stark Law, 42 U.S.C. § 1395nn(g)(3).

## COUNT SEVEN

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

### Conspiracy to Violate the False Claims Act

309.    Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

310. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

311. 31 U.S.C. § 3729(a)(1)(C) states that "any person who ... conspires to commit a violation of [§ 3729(a)(1)](A), (B), ... or (G)" is liable under the Act.

312. By engaging in the conduct set forth herein, the Individual and Corporate Defendants have conspired to violate 31 U.S.C. 3729(a)(1)(A), (B), and (G), as well as to violate the Stark Law, violations of which constitute violations of the FCA. *See https://www.justice.gov/archive/usao/fls/PressReleases/2011/110608-02.html* (press release from the United States Attorney's Office, Southern District of Florida, detailing a settlement where it was alleged that a radiology clinic violated the Stark Law and in so doing also violated the false Claims Act) (accessed October 7, 2025).

313. By reason of Defendants' acts, the Government has suffered substantial actual damages.

## COUNT EIGHT

### Violations of the False Claims Act, 31 U.S.C. § 3730(h)

### Defendants' Retaliation Against Relator

314. Relator realleges and incorporates by references the allegations of all previous Paragraphs as if such were restated herein.

315. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*, as amended.

316. 31 U.S.C. § 3730(h)(1) states that "[a]ny employee" of an employer who violates the FCA "shall be entitled to all relief necessary to make that employee ... whole, if that employee ... is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated

against in the terms and conditions of employment because of lawful acts done by the employee ... in furtherance of an action" under the FCA "or other efforts to stop 1 or more violations" thereof.

317. Relator took lawful action in opposition to Defendants' fraudulent Schemes and in furtherance of efforts to stop violations of the FCA.

318. The Wisconsin Defendants:

    a. Harassed Relator and otherwise discriminated against him in the workplace;

    b. Threatened Relator with suspension and termination; and

    c. Constructively discharged Relator from his employment with Defendant LMG as a dentist at Defendant TMJ.

319. By reason of Defendants' acts, Relator has suffered substantial actual damages.

320. By reason of Defendants' acts, Relator is entitled to "all relief necessary to make [him] whole," pursuant to 31 U.S.C. § 3730(h)(1)-(2).

## X. PRAYER FOR RELIEF

WHEREFORE Relator and the United States are entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733 and 42 U.S.C. § 1395nn, and Relator requests that judgment be entered against Defendants, including that:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended;

2. Defendants pay three (3) times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of $28,619.00 for each false claim pursuant to 31 U.S.C. § 3729 (a)(1) and 28 C.F.R. § 85.5, or as may be further adjusted;

3. Relator be awarded "all relief necessary to make [him] whole" from Defendants' retaliation against him, per 31 U.S.C. § 3730(h)(1)-(2), including attorneys' fees and costs;

4. Relator be awarded the maximum share of the damages and penalties pursuant to 31 U.S.C. § 3730(d);

5. Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

6. Defendants cease and desist from violating Stark Law, 42 U.S.C. § 1395nn(a)(1)(A)-(B);

7. Defendants pay $15,000 for each violation of the Stark Law, 42 U.S.C. § 1395nn(a)(1)(A)-(B), as amended, pursuant to 42 U.S.C. § 1395nn(g)(3);

8. Defendants pay $10,000 for each day that Defendants failed to meet the reporting requirements of 42 U.S.C. § 1395nn(f);

9. The United States and Relator be granted all such other relief as the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY**.

Respectfully submitted and dated this _____ day of November, 2025.

Cross Law Firm, S.C.
Attorneys for Relator Bhavik Desai

By: _____

Nola J. Hitchcock Cross
Wisconsin State Bar Number: 1015817
B. Harper Dickerson
Wisconsin State Bar Number: 1142160
Cross Law Firm, S.C.
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055
Email: njhcross@crosslawfirm.com
        dickerson@crosslawfirm.com

73